IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SALVADOR SILVA,

      **Plaintiff,**

vs.                                                                                                                                                                     No. 05cv0665 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's (Silva's) Motion to Reverse Administrative Decision or, in the Alternative, a Remand of Said Decision**, [Doc. No. 9]**, filed November 14, 2005, and fully briefed on January 27, 2006. On December 22, 2004, the Commissioner of Social Security issued a final decision denying Silva's application for disability insurance benefits and supplemental security income benefits. Silva seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is well taken and will be GRANTED.

### I. Factual and Procedural Background

Silva, now thirty-seven years old (D.O.B. 7/27/1968), filed his application for disability insurance benefits and supplemental security income on January 24, 2003, alleging disability since July 31, 2002, due to severe diabetes, vision problems, depression, hypertension, fatigue, and side effects from his medication. Tr. 40. Silva has a sixth grade education and past relevant work as a

roustabout oilfield worker. Tr. 14. On December 22, 2004, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding "the medical evidence reveals the claimant has diabetes mellitus and low vision impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, singly or in combination one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Tr. 15. The ALJ further found Silva retained the "residual functional capacity (RFC) to perform no more than light work activity. Tr. 17. Specifically, the ALJ found Silva "can lift 20 pounds on an occasional basis, 10 pounds on a frequent basis, stand and/or walk for a total of about 6 hours in an eight-hour work-day, can handle on a frequent basis, finger on a frequent basis, and has unlimited ability to reach in all directions; he is limited to work that does not require far visual acuity or fine near visual acuity, or working with small objects less than one inch in diameter." Tr. 17. Silva filed a Request for Review of the decision by the Appeals Council. On April 13, 2005, the Appeals Council denied Silva's request for review of the ALJ's decision. Tr. 4-6. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Silva seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Silva makes the following arguments: (1) the ALJ erred in assessing/evaluating his medical records; (2) the ALJ erred in assessing his RFC; and (3) the ALJ erred in finding he was not totally credible.

## A.  The ALJ's Assessment of Silva's Medical Records

Silva contends the ALJ "[r]ather than fully and properly addressing the treating doctors' reports, . . . seeks to justify her decision by erroneously mentioning only one or two symptoms of diabetes– [his] weight and his visual problems." Mem. in Support of Mot. to Remand at 2. The Court agrees.

In her decision the ALJ found, in pertinent part, as follows:

The claimant has a twelve year history of diabetes. According to Dr. M. Carroll's initial statement the claimant was originally diagnosed with diabetes several years ago. Dr. Carroll reported that when initially diagnosed the claimant weighed 245 pounds. <u>However, Dr. Carroll's statement and recent medical records do not support a finding of obesity</u>. In July 2003, the claimant's weight was reported at 138 pounds and height of 65.5 inches. Although the claimant's weight has fluctuated between 138 pounds to 160 pounds during the year 2003, the aforementioned body weights and height are not consistent with morbid obesity. Furthermore, it is noted that at least since the alleged onset date of July 23, 2002, the record in devoid of evidence that the claimant's weight has resulted in any residuals normally

associated with obesity. Thus, it is determined that the claimant's weight is not consistent with a severe impairment (Exhibit 4F).

** ** ** ** ** ** ** ** ** **

The claimant's complaints of visual impairment have been considered under section 2.00 of the listings. A diabetic eye examination record reveals there is no evidence of retinopathy. Visual acuity is reported at 20/30 bilaterally; the medical examiner diagnosed hyperopia and astigmatism. In considering the aforementioned evidence it is determined that the claimant does have a listing-level visual impairment (Exhibit 1F).

The diabetic impairment has been evaluated under section 9.09 of the Listing of Impairments. The <u>medical records do not confirm the existence of neuropathy</u> or interference with motor functioning of the extremities. The Lovington Clinic's reports also revealed <u>no evidence of neurological deficits</u>. In fact, the record is devoid of evidence supporting the existence of sustained disturbance of gross or dexterous movements or gait and stations consistent with a listing-level impairment.

** ** ** ** ** **

The claimant further testified that he was diagnosed with diabetes approximately fifteen years. The medical evidence reflects that the claimant became insulin dependent approximately two to three years ago. He described the medical conditions that prevent his working as diabetes, <u>blurred vision, generalized body aches and blisters on his feet and arms</u>. However, perusal of the treating records show no evidence documenting the medical complaints related to the skin are anything more than a treatable skin infection (Exhibit 1F). Furthermore, there is no evidence of a significant musculoskeletal impairment.

Tr. 15-16 (emphasis added).

Mary Carroll, M.D., is an "endocrinology and diabetes specialist." Tr. 212. Dr. Carroll practices at Eastern New Mexico Medical Center. On May 13, 2003, Dr. Carroll evaluated Silva. In a letter to Patrick J. Homer, D.O., one of Silva's health care providers, Dr. Carroll reported the following:

> He was diagnosed with diabetes at the age of 21. He <u>was overweight</u>, apparently 245 pounds, <u>at the time of this diagnosis</u>. He has been on insulin since being diagnosed with diabetes. Glucophage was started about 3 years ago in combination with his insulin. He has never been on other diabetic pills, including sulfonylureas or thiazolidinediones as far as I can determine. The patient's blood sugar control is poor. <u>Blood sugars range from 300 to 500 at various times during the day.</u> He takes NPH 30 minutes pre-breakfast and at bedtime and regular insulin 30 minutes pre-meal. His total daily dose of insulin is approximately 90 units. <u>He has never been taught how to carb-count or been on a rapid-acting insulin analog</u>. He has not seen a diabetes educator recently. He is not aware of ever seeing an endocrinologist previously. The patient's complications from diabetes include **peripheral neuropathy. He has burning paresthesias affecting both hands and feet**. **He has numbness affecting the ulnar aspect**

5

**of his hands.  He has had recurrent foot ulcers, which are very slow to heal**.  He has not had any amputations.  The patient denies any known retinopathy, nephropathy, or macrovascular disease.  He last had a dilated eye exam in May of this year, and no diabetes retinopathy was mentioned to him.  <u>He has had blurred vision over the past year or so.</u>  He states that he is due to get bifocal lenses to help with his eyesight.  The patient also complains of **urinary frequency and nocturia x6-7 and extreme fatigue**.  He reports **nocturnal diarrhea on multiple occasions for the past year and a half**.  He denies gastroparesis symptoms such as postprandial vomiting.  He also reports erectile dysfunction for the past 2 years or so, which is confirmed by his wife.  He has never tried Viagra or been evaluated for hypogonadism that he is aware.

The patient has a number of other symptoms, which could possibly be due to his severe hyperglycemia or possibly hypothyroidism.  These include diffuse body aches, myalgias, and fatigue.  I do not have a record of a recent thyroid lab check.  He denies any goiter or local compression symptoms.

On questioning, it appears the patient eats 3 meals a day with breakfast at 9:30 a.m., lunch at 1:00 p.m. and dinner at 7:00 p.m., which is the largest meal of the day.  He does not exercise on a regular basis.

**PAST MEDICAL/SURGICAL HISTORY**
1. Insulin-requiring diabetes since age 21.
2. Peripheral neuropathy.
3. Recurrent foot ulcers.
4. Erectile dysfunction.
5. Oral infection, on antibiotics.

** ** ** ** ** ** ** **

**ASSESSMENT/PLAN**
1. Insulin-requiring diabetes since the age of 21 with poor control.  The patient is currently lean and **does not appear to be responding well** to his insulin regimen.  <u>**However, he was obese at the time of diagnosis and has a positive family history of diabetes suggesting type 2 diabetes**</u>.  We will screen for endogenous pancreatic function with a C peptid and for type 1 diabetes with an anti-GAD antibody.  If the patient has type 1 diabetes, then Glucophage is unlikely to be effective for his glycemic control.  If he has type 2 diabetes, however, we would be able to use other oral agents, both insulin secretagogues and insulin sensitizers, to help improve his control.  His recent control will be evaluated with a HbA1C.  **The patient's complications of diabetes appear to include peripheral neuropathy, erectile dysfunction, and possible autonomic neuropathy**.  **His symptoms of nocturnal diarrhea and erectile dysfunction are commonly found in autonomic neuropathy, which is a complication of advanced poorly controlled diabetes**.  Most of the visit today was spent explaining to the patient and his wife the **adverse effects of hyperglycemia** in the short term, such as **fatigue, poor concentration, and irritability**, as well as in the long term with microvascular and macrovascular complications.  He is agreeable to check his blood sugar 4 times a day and to record

6

>    these in a logbook. He was given a new One-Touch glucometer today and instructed in detail on its correct use. He was also given a logbook to record his blood sugars in. He will be sent to our diabetes educator for dietary advice, and we will try and coordinate this appointment with his follow-up visit back here at our clinic. I made the patient aware that it is essential that he check his blood sugars if he is to benefit from seeing an endocrinology and diabetes specialist.
>
> 2.  Myalgias, fatigue, hair loss, and hoarseness are somewhat suggestive of hypothyroidism. We will screen for this with a TSH.
>
> 3.  Borderline-high blood pressure. Target blood pressure is less than 130/80 at all times. <u>We will screen for nephropathy with a urine microalbumin and basic metabolic profile</u>. He did have a borderline-high postassium, which may be due to Bactrim. We will recheck his potassium before considering starting him on ACE-inhibitors.
>
> 4.  Erectile dysfunction, probably due to poor glycemic control and associated endothelial dysfunction. However, he may benefit from Viagra, and there is no obvious contraindication. I reviewed its correct use with the patient and his wife today. They are aware never to take nitroglycerin with Viagra. They should try a 50 mg pill on the first occasion, and if this is not sufficiently effective they can try 100 mg at a time. We will screen for hypogonadism with a free testosterone, FSH, LH, and prolactin.
>
> The patient will be followed up in the clinic in 2 weeks time. Face-to-face time spent with the patient was 80 minutes. More than 50% of this time was spent counseling.

Tr. 210-212 (emphasis added).

On May 29, 2003, Silva returned for his follow-up with Dr. Carroll. Tr. 214-216. In a letter to Dr. Homer, Dr. Carroll informed Dr. Homer of her findings. Dr. Carroll provided the following information. Silva was checking his blood sugar four times a day as she had requested. Silva's HbA1C (glycosylated hemoglobin) was **11.0%**. The HbA1C estimates plasma glucose control during the preceding one to three months. *The Merck Manual* 170 (17th ed. 1999). The normal HbA1C level is 6%. In poorly controlled diabetics, the level ranges from 9% to 12%. *Id.* Dr. Carroll confirmed that Silva had type 2 diabetes mellitus. Dr. Carroll discontinued his NPH and regular insulin and started him on Glucotrol XL 10 mg twice a day and Lantus (long-acting

insulin) 30 units at bedtime.  Dr. Carroll would titrate the Lantus dose upward until Silva's fasting blood sugar was within normal range.  Dr. Carroll directed Silva to continue checking his blood sugar four times a day and to record the results in his logbook.  Silva's urine microalbumin was positive at 95.  Thus, Dr. Carroll also assessed Silva with diabetic nephropathy and hypertension.  Dr. Carroll prescribed Lisinopril 5 mg for the hypertension.  Dr. Carroll also suspected liver involvement due to an elevated alkaline phosphatase (136) and ordered a liver function panel.  Dr. Carroll also ordered a fasting lipid profile to evaluate Silva's lipid levels.

     On June 26, 2003, Silva returned for his follow-up with Dr. Carroll.  Tr. 217-218.  Dr. Carroll listed the following diagnosis for Silva: (1) Type 2 diabetes since age 21; (2) peripheral neuropathy; (3) diabetic nephropathy, newly diagnosed, May 2003; (4) recurrent foot ulcers; (5) erectile dysfunction with borderline-low free testosterone; and (6) hypertension, [diagnosed] May 2003.  Dr. Carroll reported Silva was recording his blood sugar levels three times a day.  The fasting blood sugars ranged from 169-280, pre-dinner, and in the 280 range at bedtime.  Dr. Carroll assessed these ranges as indicating "moderately-severe hyperglycemia."  Silva's blood glucose was 139 on that day.  Dr. Carroll indicated she had not received Silva's lab results for the fasting lipid profile and metabolic profile.  Dr. Carroll increased the Lantus insulin to 40 units and felt she may have to further increase it until Silva's fasting blood sugar was in the 80-120 range.  Dr. Carroll found Silva was tolerating the low-dose ACE inhibitor well and would order a repeat urine microalbumin in a "few months" to see if it had decreased.  Depending on the results of the urine microalbumin, Dr. Carroll would increase the ACE inhibitor.  Dr. Carroll opined Silva's hypertension was markedly improved on Lisinopril.  Dr. Carroll indicated she would see Silva in six weeks and order a HbA1C the week before his appointment.

The only mention of Dr. Carroll's evaluation and consultation follow-ups in the ALJ's decision are in reference to his weight. The ALJ determined Silva did not meet the definition of "morbid obesity." Tr. 15. However, Dr.Carroll noted Silva's weight as part of her differential diagnosis. As she reported to Dr. Homer, "he was obese at the time of the diagnosis and has a positive family history of diabetes suggesting a type 2 diabetes." Thus, the weight went to whether he suffered from type I diabetes versus type II diabetes. In fact, Dr. Carroll indicated she would "screen for endogenous pancreatic function with a C peptid and for type I diabetes with an anti-GAD antibody." Tr. 212. According to Dr. Carroll, "if he [Silva] had type 1 diabetes, then Glucophage [was] unlikely to be effective for his glycemic control." *Id.*

Although the ALJ need not discuss all of the evidence in the record, she may not ignore evidence that does not support [her] decision, especially when that evidence is "significantly probative." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996); *see also*, *Wendy Briggs v. Massanari*, no. 00-7094 (10th Cir. May 8, 2001). In this case, the ALJ failed to mention any of Dr. Carroll's other findings, evidence which is significantly probative. Dr. Carroll assessed Silva with peripheral neuropathy, recurrent foot ulcers, hypertension, and diabetic nephropathy. The record also indicates multiple elevated blood glucose levels. *See e.g.*, Tr. 211 (CBG 327); Tr. 112 (Random Accu-Chek is 296); Tr. 115 (Random Accu-Chek 252); Tr. 122 (Random Accu-Chek 452; HbA1C 10.9); Tr. 125 (random blood sugar 458); Tr. 126 (random blood sugar 425); Tr. 130 (random blood sugar 380); Tr. 131 (random blood sugar 462). At these high levels, Silva would experience extreme fatigue, nausea, blurred vision, irritability, fungal and bacterial infections, polyuria (frequent urination), and nocturia. *The Merck Manual* 165-176 (17th ed.

1999).  Moreover, the record indicates Silva was hospitalized due to diabetic ketoacidosis.

Severe chronic hyperglycemia will cause diabetic ketoacidosis.  *Id.* at 177.

The Court also notes the ALJ found the evidence "contradicts claimant's allegations of disability."  Tr. 17.  In support of this finding, the ALJ noted the following in her decision:

> The Lovington Medical Clinic's progress notes reported the claimant engaged in physical activities that clearly contradict claimant's allegations of disability.  Emergency room record notes document that the claimant fell off his roof when attempting to remove Christmas decorations, causing minimal degenerative spinal changes.  He also sustained a sprain to his arm when he attempted to move a "big screen" television.

Tr. 16-17.  However, the "sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity."  *Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir.1983)).

Finally, the ALJ found Silva was noncompliant with his diabetic treatment regimen.  Tr. 16, 17.  The regulations provide that a claimant will not be found disabled if he or she, without good reason, fails to follow prescribed treatment that can restore the ability to work.  20 C.F.R. 416.930(a), (b).  The Tenth Circuit has explained that the ALJ <u>must</u> meet four elements before denying benefits for failure to follow prescribed treatment:  "(1) the treatment at issue should be expected to restore the claimant's ability to work;  (2) the treatment must have been prescribed;  (3) the treatment must have been refused;  (4) the refusal must have been without justifiable excuse."  *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir.1985).  Substantial evidence must support each element.  *Id.*  Inability to pay for prescribed treatment may provide a justification for a claimant's failure to seek treatment.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1489-90 (10th Cir.1993).  Moreover, it was the ALJ's duty to inquire, as part of development of the record, whether Silva could in fact afford treatment and whether any alternative forms of payment were

available to him. *See, e.g., Neil v. Apfel*, 1998 WL 568300, at *3 (10th Cir. Sept. 1, 1998) (unpublished)(citing *Thompson*, 987 F.2d at 1492).

    Accordingly, the Court will remand this action to allow the ALJ to reevaluate Dr. Carroll's medical notes, request any updated medical records from Dr. Carroll, and follow the analysis set forth in SSR 82-59. *See* SSR 82-59, 1982 WL 31384 (1982)(Titles II and XVI: Failure to Follow Prescribed Treatment).  The ALJ should also request Dr. Carroll or his primary health care provider complete a Medical Source Statement of Disability to do Work-Related Activities (Physical).

    Because the Court reverses the agency's denial of benefits on Silva's first issue, the Court need not consider his remaining allegations of error.

    A judgment in accordance with this Memorandum Opinion and Order will be entered.

    **DON J. SVET**
    **UNITED STATES MAGISTRATE JUDGE**